UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ERIC SANDELL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | CASE NO. 1:06-cv-0522-DFH-TAB |
| THE PRUDENTIAL INSURANCE ) | |
| COMPANY OF AMERICA and DYNAMIC ) | |
| INDUSTRIES, INC. LONG TERM ) | |
| DISABILITY PLAN, ) | |
| ) | |
| Defendants. ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Eric Sandell has sued defendants Prudential Insurance Company of America and Dynamic Industries, Inc. Long Term Disability Plan for wrongfully terminating his long term disability benefits. He was receiving the benefits under an employee benefit plan governed by the federal Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 *et seq.*

The parties agreed that the court should make a *de novo* decision about Sandell's eligibility for continued benefits rather than considering only whether defendants' termination of benefits was arbitrary or capricious. Neither side elected to offer additional evidence beyond defendant Prudential's claim file. Plaintiff objected to consideration of some of the materials, but the court denied his motion *in limine* and concluded that his arguments addressed the weight of the

challenged evidence rather than its admissibility. The court now states its findings of fact and conclusions of law. The substance of a particular matter shall determine whether it is treated as a finding of fact or a conclusion of law. As explained below, the court finds that Sandell is disabled within the meaning of the plan, but his disability is "primarily based on self-reported symptoms." The plan's two-year limit on benefits for such disabilities bars further benefits for him.

*Findings of Fact*

Plaintiff Eric Sandell began working for Dynamic Industries, Inc. in February 1992. He was a welder, assembler, and machine operator, a job with heavy physical demands. In February 2000, he was injured in an accident at home. He fell and broke five ribs. The injury caused the onset of myofascial pain syndrome. In March 2002, he also developed pain in his back. His last day at work was March 20, 2002, and he then stopped working because of the pain.

Sandell applied for and was granted long term disability benefits under his employer's plan through defendant Prudential, beginning in September 2002. The plan provides for initial benefits up to 36 months if an employee becomes unable to perform the material and substantial duties of his regular occupation. The parties agree that Sandell has been unable to perform the material and substantial duties of his regular occupation as a welder, assembler, and machine operator since March 21, 2002.

After 36 months of benefits, the plan provides for continued benefits only if the employee is "unable to perform the duties of any gainful occupation" for which he is reasonably fitted by education, training, or experience.  R. 42.  The plan also provides limits on disabilities caused by mental illness and by "self-reported symptoms."  Specifically, the plan provides:  "Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on self-reported symptoms have a limited pay period during your lifetime."  R. 50.  The plan then includes this definition:

> Self-reported symptoms means the manifestations of your condition, which you tell your doctor, that are not verifiable using tests, procedures and clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headache, pain, fatigue, stiffness, soreness, ringing in ears, dizziness, numbness and loss of energy.

R. 50.  The plan includes a limited pay period of 24 months for disabilities based on self-reported symptoms and mental illness over a participant's lifetime.  *Id.*

On September 1, 2005, Prudential notified Sandell that his benefits were terminated because it found he was able to perform the duties of at least two gainful occupations, as a maintenance scheduler and general inspector.[1]

---

[1]The long term disability plan defines "gainful occupation" as "an occupation, including self-employment, that is or can be expected to provide you with an income equal to at least 62% of your indexed monthly earnings within 12 months of your return to work."  R. 42.

Sandell appealed the decision to terminate his benefits. After some jousting over whether Sandell would submit to an independent medical examination and a functional capacities evaluation, Sandell filed this suit on March 31, 2006. On April 3, 2006, Prudential rejected his appeal. During this litigation, Sandell did not offer additional evidence of his medical condition, and Prudential did not use Rule 35 of the Federal Rules of Civil Procedure to force an independent medical examination or a functional capacities evaluation.

The principal focus here is not on the procedures Prudential used to make its decision but on whether its decision is correct. This is one of those relatively scarce ERISA benefits cases where the standard for judicial review is *de novo*. In other words, the court does not defer to Prudential's decision to deny benefits. The court takes a fresh look at the evidence and decides for itself whether plaintiff has proved by a preponderance of the evidence that he is unable to perform the duties of any gainful occupation and is otherwise entitled to benefits under the terms of the long term disability plan. The focus is on Sandell's condition as of September 2005 when his benefits were terminated after the initial 36 months.

The principal challenge, and ultimately the critical fact, in this case, is that Sandell's claim of disability is based on subjective claims of pain. The term "subjective" is not intended to be disparaging but only descriptive. In such cases, doctors, insurers, and courts must be cautious about the potential for malingering and deception, but they must also recognize that a person can have genuinely

severe and chronic pain that defies objective measurement and verification. See *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004); *Sarchet v. Chater*, 78 F.3d 305, 306-07 (7th Cir. 1996) (discussing fibromyalgia); see also *Green-Younger v. Barnhart*, 335 F.3d 99, 103 n.6 (2d Cir. 2003) (noting that myofascial pain syndrome is closely related to fibromyalgia); *Alexander v. Barnhart*, 287 F. Supp. 2d 944, 965 (E.D. Wis. 2003) (citing cases on relationship between two conditions).

Since 2002, Sandell has received extensive treatment for serious pain. He was treated by four different pain management physicians, as well as his family physician. Early treatments included "injections without much relief" and intradiscal electrothermal therapy (IDET). R. 465-66. The most successful treatment has been large and increasing doses of strong, narcotic pain medications: methadone, morphine, and oxycodone.

The evidence shows that after the early efforts to find effective pain treatments, Sandell eventually turned to Dr. Miethke, his family physician, who monitored his condition and prescribed pain medication to manage Sandell's pain. Sandell could not afford treatment with other doctors. Dr. Miethke apparently was willing to treat him for whatever Sandell managed to pay. See R. 360A (Prudential case manager note reporting on May 11, 2005 that Dr. Miethke was the only doctor Sandell could see because he had no money).

Focusing on Sandell's condition in 2005, on March 2, 2005, Dr. Miethke reported that he was treating him for chronic myofascial pain syndrome in the right thoracic wall. Sandell reported that his pain was 7 on a scale of 1 to 10 on most days. At that time, his doses of methadone and morphine gave immediate relief and were "well tolerated." The doctor's impression was that the myofascial pain syndrome was worse. His plan was to continue the treatment and monitoring but to raise the methadone dosage to 80 milligrams three times a day. R. 486.

On March 31, 2005, Dr. Miethke filled out an attending physician's statement for Prudential. He said that Sandell suffered "severe chest pain with virtually any physical activity." R. 445. His prognosis for returning to work was "poor at present," and there was no plan at that time for returning to work. Sandell was taking methadone and morphine three times a day. R. 446.

On April 5, 2005, Prudential's claim manager interpreted Dr. Miethke's opinion as being that Sandell was capable of performing sedentary work. R. 314. The case manager also raised the possibility of reviewing the case with "clinical" and determining the appropriateness of a functional capacities evaluation and/or an independent medical examination to assess Sandell's current level of functioning.

On June 6, 2005, Dr. Miethke saw Sandell again. He noted that the methadone, morphine, and Xanax did "lead to some sedation." R. 566. Sandell rated his pain as generally between 3 and 5 on the scale from 1 to 10 "as long as he is relatively inactive." The impression was that the myofascial pain syndrome was stable. Dr. Miethke noted that Sandell had been turned down for Social Security disability benefits. He wrote that he did not think Sandell would be able to work at "the physical labor type of job that he had previously," and he gave Sandell a prescription for vocational rehabilitation. There is no evidence that Sandell ever pursued the vocational rehabilitation prescription. The next day, Sandell reported to Prudential that the doctor had recommended that he try vocational rehabilitation and possibly try some sedentary work. R. 360-61.

On June 29, 2005, a physical therapist who was reviewing Sandell's case for Prudential wrote: "Based on findings it appear[s] that [Sandell] would be suited for a full time position in which he can alter his postures from sitting to standing with perhaps the ability to be productive in both positions with limited bending, twisting and lifting. There are minimal physical exam findings within records received – primarily subjective complaints of myofascial pain – which would alter these restrictions." R. 315. She also interpreted Dr. Miethke's opinion as being that Sandell "is capable of alternate work."

On July 29, 2005, Dr. Miethke saw Sandell again. He noted that Sandell's pain was worse, "typically running 5 on a 10 scale and he has been less active

overall." R. 534. He still had "considerable chest wall tenderness." Dr. Miethke's impression was that the myofascial pain syndrome was worse. He raised Sandell's dosage of methadone to 100 milligrams three times a day, raised Sandell's dosage of Xanax to two milligrams four times a day, and continued the morphine. R. 592. This was Sandell's last examination before Prudential terminated his benefits.

On August 8, 2005, Dr. Miethke filled out a work status form for Sandell. R. 597-98. Most important, he reported that Sandell could sit for up to two hours, stand for one hour, and walk for one hour in an eight-hour work day, all "with rest." He also that Sandell could lift and carry up to 20 pounds "occasionally" and that he could reach less than 18 inches frequently and reach more than 18 inches and reach overhead occasionally. He also noted that Sandell could do simple grasping, pushing, and pulling with both hands, but indicated uncertainty about Sandell's fine manipulation skills, most likely because of Sandell's heavy regimen of narcotic medication. Dr. Miethke also imposed restrictions on working at unprotected heights, being around moving machinery or changes to temperature and humidity, driving automotive equipment, and being exposed to gas, dust, and fumes, all based on Sandell's unsteadiness as a result of his medication.

At the end of the form, Dr. Miethke was given a choice between certifying that his opinion was "based on the patient's self reported severity of symptoms" or was "based on the following specific measurable or observable objective

findings." Dr. Miethke said his opinion was based on Sandell's self-reporting about the severity of his symptoms. R. 598.

On August 19, 2005, the same Prudential physical therapist reviewed Sandell's file again, including the information from Dr. Miethke's work status form with his limit of four hours of work per day and from the July 29th note that the pain was worse and that narcotic medications were being increased. The physical therapist opined that "it would be reasonable to assume that [Sandell] could be functional in full time work with the ability to alter postures within the same physical requirements outlined in Dr. Miethke's WSF." R. 316. She also noted: "There is nothing in file which specifically supports the need for part time work."

On October 27, 2005, Dr. Miethke wrote to plaintiff's attorney to provide information about Sandell. After summarizing Sandell's long history of pain, Dr. Miethke noted that the only specific abnormality that had been demonstrated, despite an extensive diagnostic examination was a tear in the L3-4 disk annulus. But that tear "did not appear to be the source for his pain as his pain was located in the right lower lateral posterior chest wall radiating up to the scapular area as well as down into the right flank and seem[s] to emanate from the region where the rib fractures had occurred." R. 683. Dr. Miethke continued: "This is quite characteristic of myofascial pain syndrome, the specific physiologic nature of which is not known[;] however, it does oftentimes follow traumatic accidents and leads to a chronic burning dysesthetic type of pain in a local regional distribution

around the site of prior trauma." *Id.* Dr. Miethke also noted significant side effects from the powerful pain medications, including "sedation and unsteadiness when walking or doing fine activities with his hands." *Id.* Dr. Miethke had no reason to believe that Sandell was abusing his pain medications. Dr. Miethke said he believed Prudential's reviewers had "overestimated" Sandell's physical capacity and that the combination of pain and "significant although tolerable side effects" of the pain medication left Sandell in "no reasonable condition to hold down any type of full-time employment." R. 684. He acknowledged, however, that he was a specialist in internal medicine and not a specialist in physical or occupational medicine. *Id.*

After receiving Dr. Miethke's letter, Prudential did not change its position, but it referred the case to Dr. Phillip Marion, a specialist in physical medicine, rehabilitation, and pain management. Dr. Marion did not examine Sandell. Based on his review of Sandell's medical records, Dr. Marion offered his opinion in a letter dated February 24, 2006. R. 381-84. Dr. Marion reported no "objective impairment" documented by radiological studies, electro-diagnostic evaluation, or neurological examination. Dr. Marion acknowledged the long history of depression and complaints of pain and the extensive scope of pain treatments, including strong medications. He concluded: "There remains no objective findings on physical examination or report of significant pathology via radiological or electro diagnostic studies. The lack of objective impairments does not support any specific occupational restrictions." R. 384.

After considering all the evidence, the court finds that plaintiff Sandell meets the plan's criteria for disability. Sandell has certainly offered substantial evidence that he meets the criteria. That evidence includes long-term treatment for serious chronic pain, culminating in long-term and constant use of strong narcotic pain medication, all under the supervision of pain specialists and a family physician who has been thoroughly familiar with his case. In particular, Dr. Miethke has opined that Sandell could not work more than four hours per day, with rest. The court has substantial reasons to credit Dr. Miethke's opinion. It is based on long-term care of Sandell. The court is not persuaded that he has shaded his opinion to help out his patient. Dr. Miethke has offered careful and well-qualified opinions based on his long-term care of Sandell. Although Dr. Miethke is not a specialist in pain management or in vocational medicine, his familiarity with Sandell's case and with the strength of the narcotic pain medications used to treat Sandell support the credibility of his opinion.

The evidence on the opposing side simply is not as persuasive. Dr. Marion is a specialist in physical medicine, rehabilitation, and pain management. However, he never examined Sandell. He merely reviewed the medical records. Most important on the threshold issue of disability, Dr. Marion did not address the question directly. His report focused on the absence of objective examination or laboratory reports that would support specific occupational restrictions. Dr. Marion acknowledged the long history of pain treatment, including the high

dosages of narcotics for Sandell. Dr. Marion's written analysis indicates that Sandell does not suffer from *any* limitations on his ability to work. No party supports that view. Even Prudential acknowledges that Sandell is no longer able to do the heavy and demanding work he did for Dynamic Industries. The focus on the absence of objective criteria seems to have dominated Dr. Marion's inquiry. He simply did not reach the question whether Sandell's subjective pain symptoms and its treatments ultimately make it impossible for him to hold full-time gainful employment.

Prudential notes that Sandell refused to submit to an independent medical examination and a functional capacities evaluation. Prudential also notes that Sandell apparently declined to seek a second opinion, or obtained one that he chose not to share with the court. The history of the parties' maneuvering has detracted from the credibility of both sides. Prudential could have used Rule 35 of the Federal Rules of Civil Procedure and the plan terms to insist on an independent medical examination and/or a functional capacities evaluation. It chose to do neither.

Prudential also suffers some credibility problems. Its original decision to terminate benefits was made by a physical therapist who apparently had no direct contact with Dr. Miethke. Its decision on appeal was based on the opinion of Dr. Marion, who did not examine Sandell and who answered a question different from the threshold disability issue the court must determine: whether Sandell has

been "unable to perform the duties of any gainful occupation" for which he is reasonably suited by education, training, or experience.

For all of these reasons, the court finds that Sandell has been and is totally disabled within the meaning of the plan. The decisive problem for his case, however, is the 24-month limit on benefits for disabilities "primarily based on self-reported symptoms." R. 50. On this question, Dr. Marion's focus on the absence of objective indications of limits on Sandell's condition and Dr. Miethke's acknowledgment that the limits he found were based on Sandell's reports of his symptoms are probative.

Plaintiff argues that, as a matter of fact, he has objective evidence of impairment, relying on the evidence of a tear in his spinal disk at the L3-4 level. The problem is that Sandell's doctor explained that the tear does not account for the disabling pain: "This does not appear to be the source for his pain as his pain was located in the right lower lateral posterior chest wall radiating up to the scapular areas as well as down into the right flank and seem to emanate from the region where the rib fractures had occurred." R. 683 (Dr. Miethke letter of Oct. 27, 2005). The evidence shows that the disabling pain that plaintiff suffers is based on self-reported symptoms. The subjective nature of the complaints does not make the pain any less real, but it has a decisive effect based on the terms of the disability insurance plan.

*Conclusions of Law*

The court has jurisdiction over the subject matter pursuant to 28 U.S.C. § 1331, and plaintiff's right of action to recover benefits allegedly due to him under the terms of the employee benefit plan arises under 29 U.S.C. § 1132(a)(1)(B). The court also has jurisdiction over the parties. As the parties have agreed, the court reviews *de novo* whether plaintiff Sandell qualifies for additional long term disability benefits under the defendant plan.

Consistent with the findings of fact stated above, the court concludes that plaintiff Sandell has met the defendant plan's standard for total disability, but that his disability is "primarily based on self-reported symptoms." The plan's two-year limit on benefits for such disabilities bars further benefits for Sandell.

Plaintiff has also argued as a legal matter that defendants should not be able to rely on the limit on self-reported symptoms because they did not raise the issue in the original denial or earlier in the lawsuit. This argument is not persuasive. Prudential terminated benefits for Sandell in 2005 without ever reaching the application of the 24-month limit to disabilities resulting primarily from self-reported symptoms. Prudential's April 2006 letter rejecting Sandell's appeal raised the limit in connection with the depression element of Sandell's original disability under the 36 months of benefits available when he was disabled from performing his regular occupation.

Sandell has not offered any legal basis for barring Prudential from relying on the 24-month limit. He has not shown any form of estoppel that would prevent defendants from enforcing the terms of the written plan. Without exploring the broader question of when equitable estoppel may apply under ERISA, it is clear that before estoppel may be available at all, a plaintiff must show detrimental reliance on a misstatement by the defendant. *E.g., Bowerman v. Wal-Mart Stores, Inc.*, 226 F.3d 574, 588 (7th Cir. 2000); *Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 585 (7th Cir. 1999). Sandell has not shown that defendants made any misstatement or that he relied to his detriment by failing to address the issue, by failing to take relevant discovery, or by failing to offer additional relevant evidence.

Prudential denied benefits without ever reaching the 24-month limit. The court is not aware of any requirement that an ERISA plan administrator who denies benefits must think through all potential alternative grounds that might support its decision in the event that a court later rejects the stated principal grounds. Such a requirement could impose a heavy administrative and legal burden on plan administrators to think through many hypothetical legal and plan interpretation questions even where those questions are unlikely ever to arise.

Sandell's argument bears a resemblance to the "mend the hold" doctrine, which forbids a contract party, particularly an insurance company, from switching its defenses in the middle of litigation over a contract. See generally *Utica Mutual*

*Ins. Co. v. Vigo Coal Co.*, 393 F.3d 707, 716 (7th Cir. 2004) (discussing Indiana law), citing *National Hame & Chain Co. v. Robertson*, 161 N.E. 851, 853 (Ind. App. 1928), *Houben v. Telular Corp.*, 309 F.3d 1028, 1036 (7th Cir. 2002), *United States v. Newell*, 239 F.3d 917, 922 (7th Cir. 2001), and *Harbor Ins. Co. v. Continental Bank Corp.*, 922 F.2d 357, 362-64 (7th Cir. 1990). "Mend the hold" does not apply here. Prudential's reliance on the 24-month limit is not inconsistent with any positions it has taken in this lawsuit. Moreover, the 24-month limit defense is consistent with and is even implicit in Prudential's first line of defense, which is its theory that the evidence does not show total disability. The 24-month limit is in essence a narrower form of the broader basis on which Prudential denied benefits.

The plan in this case puts a 24-month lifetime total limit on benefits for disabilities based primarily on mental illness and subjective symptoms. The evidence shows that Sandell has already had more than 24 months of such benefits because his initial 36 months of disability benefits were based on his inability to perform the duties of his regular occupation as a result of depression and subjective complaints about pain. Under the terms of the plan, he is not entitled to further benefits because his continuing disability is primarily based on subjective pain symptoms. Defendants are entitled to judgment in their favor.

The court denies both sides' requests for an award of attorney fees under 29 U.S.C. § 1132. Sandell is not a prevailing party. Prudential is not entitled to

attorney fees because Sandell's position was substantially justified and was not unreasonable or vexatious. See *Sullivan v. William A. Randolph, Inc.*, 504 F.3d 665, 672 (7th Cir. 2007). In fact, Sandell overcame a high obstacle by proving actual total disability to the court's satisfaction. The court will enter final judgment for the defense, without a fee award.

So ordered.

Date: December 13, 2007

_____
DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Edna Sybil Bailey
WILSON ELSER MOSKOWITZ EDELMAN & DICKER
edna.bailey@wilsonelser.com

Jason Michael Kuzniar
WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
Jason.Kuzniar@wilsonelser.com

Daniel John McMahon
WILSON ELSER MOSKOWITZ EDELMAN & DICKER, LLP
mcmahond@wemed.com

Bridget O'Ryan
boryan@indy.rr.com

Talia Betty Ravis
THE LAW OFFICE OF TALIA RAVIS
taliravis@gmail.com